Filed 3/19/13  P. v. Kaczmarczyk CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>MARK KACZMARCZYK,<br><br>     Defendant and Appellant. | D059889<br><br><br><br>(Super. Ct. No. SCD218395) |

APPEAL from a judgment of the Superior Court of San Diego County, John S. Einhorn, Judge.  Affirmed.

Defendant Mark Kaczmarczyk, along with his wife (Anita), was charged with eight counts of sexual abuse of four minor victims.  After the close of the prosecution's case, the court granted Kaczmarczyk's Penal Code[1] section 1118.1 motion to dismiss the four charges involving two of the alleged victims.  The jury ultimately convicted

---

1       All further statutory references are to the Penal Code unless otherwise specified.

Kaczmarczyk of the two charges involving one of the alleged victims,[2] but acquitted Kaczmarczyk of two similar charges involving a different alleged victim. Kaczmarczyk was sentenced to an aggregate prison term of eight years.

On appeal, Kaczmarczyk asserts the evidence was insufficient to support the convictions. He also asserts the court erred when it refused to allow the jury to hear that charges involving two other alleged victims had been dismissed, he was denied effective assistance of counsel, and the cumulative errors denied him a fair trial.

I

FACTUAL BACKGROUND

A. Prosecution Case

*The Day-care Operation*

Anita operated a day-care facility in the apartment she shared with Kaczmarczyk. There were usually about four children, whose ages ranged from six weeks to three or four years old in attendance at the facility.

Jane Doe, the victim of the two offenses of which the jury convicted Kaczmarczyk, turned two years old in April 2007 and attended day care at Kaczmarczyk's apartment starting in April 2007. Jane Doe's mother (Vanessa) believed Anita was in charge of the children and Kaczmarczyk (who was usually present) only

---

[2] The jury found Kaczmarczyk guilty of committing a lewd act on a child under the age of 14 (§ 288, subd. (a), count 8) and felony child abuse (§ 273a, subd. (a), count 7), and found true the special allegation, alleged in connection with count 8, that Kaczmarczyk had engaged in substantial sexual conduct within the meaning of section 1203.066, subdivision (a)(8).

2

helped Anita and did not have primary responsibility.  However, there were times when Kaczmarczyk was home with some of the children when Anita was not present.  Ms. Rogers, who worked for Anita a few days a week in April and May 2007, testified Kaczmarczyk talked to the kids but did not interact much with them.[3]

*The Alleged Molestation*

Jane Doe's parents, Vanessa and Patrick, were in divorce proceedings at the time Jane Doe was attending Anita's day-care facility.[4]  Vanessa had custody of Jane Doe for the weekend starting Friday, September 7, 2007.  Because of Vanessa's work schedule, Jane Doe was placed at Anita's day care on that Friday, as well as on Saturday and Sunday, and stayed there from 6:00 a.m. to 6:00 p.m.  Vanessa watched Jane Doe on September 10 until 7:00 p.m., then briefly left Jane Doe at Anita's day care but picked her up around 8:30 p.m.  Jane Doe had no genital injuries prior to September 11, 2007.

On September 11, 2007, Vanessa (who was suffering from strep throat) left Jane Doe at Anita's at 7:00 a.m., with plans that Patrick would pick her up later that day.  However, Vanessa returned to Anita's around noon that day because she was worried Jane Doe might have been infected with her strep throat.  Kaczmarczyk and Anita were

---

[3]    Rogers also testified that Kaczmarczyk constantly made inappropriate sexual comments to her.

[4]    Patrick testified Kaczmarczyk talked to him about the divorce and even tried to play matchmaker for Patrick.  Vanessa testified Kaczmarczyk asked her about her sex life with Patrick when Anita was not present, which made Vanessa uncomfortable. Kaczmarczyk also constantly made comments about her appearance, and wanted to set her up with one of his friends.  After a while, Kaczmarczyk hugged Vanessa when she came to the facility, which also made her uncomfortable.

there when Vanessa arrived. Patrick, who had been out of town, returned on September 11 and went to Anita's to pick up Jane Doe. When he arrived, Kaczmarczyk, Anita and Vanessa were there. Patrick took Jane Doe home.

Jane Doe was unusually "fussy" after Patrick picked her up on September 11. After arriving at Patrick's, both Jane Doe and Patrick took naps. Patrick did not change her diaper until around 6:00 p.m. that night. The diaper was wet with very dark-looking urine. Jane Doe also did not eat much dinner, which was unusual, but Patrick thought she might be getting sick as Vanessa feared. After dinner, Patrick and Jane Doe went outside where she appeared to play normally. She did not fall or otherwise injure herself while outside. After they went inside shortly before 8:00 p.m., Patrick prepared a bath for Jane Doe. When he removed her diaper, there was a spot of dark red blood on it. Jane Doe also had blood on the outside of her vaginal walls, but Patrick could see no injury. Jane Doe had never had blood or bleeding from her vaginal area before.

Patrick tried phoning Vanessa to tell her about the blood, and left several messages, but he could not reach her, so he finished bathing Jane Doe and put her to bed while waiting for Vanessa to return his call. Before Vanessa returned his call, Patrick received a phone call from Kaczmarczyk around 9:00 p.m. Kaczmarczyk asked if everything was okay and if Patrick was bringing Jane Doe back to day care the next day. It was unusual for Kaczmarczyk to call Patrick that late at night. Patrick did not mention his suspicions about Jane Doe's condition because he did not want to jump to conclusions. Patrick was suspicious of Kaczmarczyk because Jane Doe had spent a lot of

4

the preceding four days at day care and because she was unusually fussy, she lacked her usual appetite, there was blood in her diaper, and because of the unusual phone call.

Patrick finally spoke to Vanessa around 9:30 p.m. that night. Patrick, who was very upset, told her about the blood spot in Jane Doe's diaper. Vanessa called her mother, who told Vanessa that both she and Vanessa had medical issues involving blood in their urine when they were young and had operations to correct it. This provided some reassurance to Patrick and Vanessa, and they decided to let Jane Doe continue sleeping but to take her to a doctor the next day.

The next morning, Jane Doe had another smudge of blood on her diaper. Patrick had planned to drop Jane Doe at day care, go into work to seek permission to take the day off, and to call the medical clinic for an appointment. He left Jane Doe at the day care that morning. Patrick did not tell Anita about the blood. Because Vanessa was still sick that day, she checked in at work and then went to retrieve Jane Doe from Anita's day care. She took Jane Doe back to her apartment, where she rendezvoused with Patrick shortly before noon on Wednesday, September 12. Patrick asked Vanessa to look at Jane Doe's genital area. When Vanessa took off Jane Doe's diaper, both parents could see a red, fresh-looking scratch inside the lip of her vagina. It was not bleeding but had not yet scabbed over. They took Jane Doe to Rady Children's Hospital.

Dr. Murray, a pediatrician trained and experienced in child abuse, examined Jane Doe on the afternoon of September 12. Although Jane Doe was at first normal and playful during the physical examination, she cried and struggled when Dr. Murray conducted a detailed but noninvasive genital examination. Dr. Murray's examination and

5

findings were that Jane Doe's injuries were definitive evidence of sexual abuse. The level of healing (combined with the amount of blood Dr. Murray saw on Jane Doe's night and morning diapers and her behavior patterns on September 11) led her to conclude the injury was inflicted sometime between 7:00 and 11:30 a.m. on September 11, although it could have happened during the evening of September 10, but this was less likely.

Children's Hospital called the police, and Detective Vella responded. Patrick and Vanessa were both very upset and crying. Vella interviewed each parent separately and tested a sexual assault kit from Patrick. Three officers went to Anita's day-care facility the following day; Anita was present but Kaczmarczyk was not. They questioned her as a witness and were not aggressive with her.

Anita was nervous, cried at times, and changed her statements as she talked. When officers asked if she knew why they were there, she said "[Jane Doe]" because Jane Doe had not come to day care that day and there had been phone calls with Jane Doe's grandmother. Anita told them Jane Doe had been at day care on Wednesday (September 12) and, when asked what hours Jane Doe had been there on Tuesday, September 11, Anita gave varying times but finally settled on 7:00 a.m. to around 11:00 a.m.[5] Anita said she had not left Jane Doe alone on September 12, and had not left Jane Doe with other people on either September 10 or 11. She could not think of anyone who

---

5        At one point, Anita said Jane Doe had not been there at all on September 12. One of the officers testified it was difficult to get responses from Anita about specific dates, and it was difficult to follow her answers. She said she had a log of the children on her computer but an FBI forensic search of the computer revealed no log sheets, and she had no sign-in sheets or logs for the day care.

had access to Jane Doe alone.  There had been no unusual occurrences at the day care nor any complaints from parents.

Anita said she had changed Jane Doe's diaper on September 12 and it was still in a pail.  She was the only one who changed diapers on the children, and she would have noticed if any of them had been bruised or injured.  Anita said she had noticed nothing unusual about Jane Doe on September 10.  However, she paused for quite a period of time when asked about September 11.  She finally said Jane Doe was sleeping a little bit more than normal but there was nothing physically wrong with her.  She stated Jane Doe was at day care from around 6:00 or 7:00 a.m. through 11:30 a.m. on September 11, and approximately the same period on September 12.  Anita did not leave the day care on September 12.

During Anita's interview, Kaczmarczyk phoned their apartment.  An officer could hear Kaczmarczyk's voice on the answering machine say: "Anita, this is Mark.  I need to update you on a few things. . . . [¶] . . . [¶] And, uh, well, oh, and I was just wondering if you've heard from, uh, either Patrick or Vanessa pertaining to, uh, what's going on with, uh, that situation.  So give me a call if you can."

*The Other Children Evidence*

There was evidence introduced to support the prosecution's charges that three other children at the day care--Deven, John Doe, and Jack--were victims of abuse.

7

The information charged Kaczmarczyk with two counts involving John Doe.[6] John Doe attended Anita's day care from April through June 2007, when he was two years old. He was not very verbal. His parents were toilet training him during this period. In mid-June, when John Doe's mother (Adrianne) picked him up from day care, Anita said she was overwhelmed and could not help to potty train him, and asked Adrianne to take him out of day care or to put him back in diapers. Adrianne talked with Anita and thought they had agreed to continue potty training John Doe. However, Adrianne started looking for another day care because she was uncomfortable with Kaczmarczyk. For example, one day when Adrianne was walking to her car with her son, Kaczmarczyk grabbed her arm and told her she was the cutest of them all, which made her very uncomfortable.

On June 29, 2007, Adrianne took John Doe home from day care and saw the end of his penis was darkly bruised. This was a new injury. Kaczmarczyk and Anita were present when Adrianne picked John Doe up and neither mentioned any injury. Adrianne asked John Doe about the injury but got no clear answer. When Adrianne called Kaczmarczyk and Anita to as what had happened, Kaczmarczyk said he had no idea. Anita proffered one explanation and, after Adrianne told Anita that explanation was not logical, gave another explanation. Adrianne never returned to Anita's day care. Adrianne

---

[6] The jury found Kaczmarczyk not guilty as to these counts. However, the jury convicted Anita of misdemeanor child abuse as to John Doe.

took photographs of the injury and noted the details, but did not contact police or take John Doe to a doctor, and the bruising resolved itself in about one week.[7]

The information also charged Kaczmarczyk with two counts involving Jack.[8] Jack was two months old when he was placed in Anita's day care. Jack's mother, Carolyn, noticed Kaczmarczyk was frequently home alone with the children. Twice, when Carolyn was dropping off or picking up Jack, she noticed Kaczmarczyk was wearing only a towel and was wet, as if he was just getting out of the shower. Although Kaczmarczyk said he should not be standing there, he continued to stand there and did not go to his bedroom. Kaczmarczyk also made sexually explicit comments to Carolyn, and walked her out to her car every day even though she told him it was unnecessary.

In late August or early September 2007, after Jack's parents collected Jack from day care, they noticed injuries when they changed his diaper, including bluish or greenish discoloration of Jack's testicles, and three fresh, raised welts, about one inch long,

---

[7]    Dr. Murray reviewed the photographs of the bruising. She stated the injury required forceful compression of the tip of the penis and was not self-inflicted. Dr. Murray had seen children on whom the tip of the penis had been pinched or forcefully squeezed as punishment for toilet training accidents. Dr. Murray concluded the benign explanations proffered by Anita to Adrienne to account for the injury would not have caused this injury.

[8]    These counts were ultimately dismissed under section 1118.1 for insufficient evidence. However, over defense objection, the court permitted the jury to consider the evidence under Evidence Code sections 1101 and 1108 when assessing the charged counts as to Jane Doe and John Doe.

9

between his testicles and anus.[9] On another occasion, after Nathan picked Jack up, Nathan saw a coarse, thick and kinky dark hair on Jack that looked like a pubic hair. Nathan said it was definitely not his or his wife's pubic hair. Because Carolyn became uncomfortable using Anita's day care, Nathan picked Jack up one day and was about to tell her that Jack would not be returning when Anita told Nathan they were shutting the day care as of that day.

The information also charged Kaczmarczyk with two counts involving Deven.[10] Deven was in Anita's day care from mid-August to Mid-September, 2007, when Deven was just over one year old. When police searched the day care in connection with their investigation of Jane Doe, one of the diapers they seized had fecal matter and blood that came from Deven. Dr. Murray could not confirm that Deven had been penetrated or abused merely from the presence of blood in the diaper, because a young child can bleed from fissures occurring when they pass a hard stool. A young child would heal quickly from a penetration to his anus, and after a week injuries would not be visible. If Deven suffered no other problems (such as constipation, bowel problems, digestion problems or intestinal problems), then blood from the anus could be attributable to trauma. Deven's father, who had primary custody of him, testified Deven was healthy during that period

---

[9]    Dr. Murray reviewed Jack's medical records and stated the scratches were caused by a fingernail or some sharp object rubbed down the skin with enough force to cause damage under the skin. The marks were not diaper rash.

[10]    These counts were also dismissed under section 1118.1 for insufficient evidence. However, the court permitted the jury to consider the evidence under Evidence Code sections 1101 and 1108 when assessing the charged counts as to Jane Doe and John Doe.

and had no constipation, diarrhea, or any other illness that could have caused the bleeding in his diaper.[11]

*Kaczmarczyk's Flight*

A social worker was assigned to investigate Kaczmarczyk and Anita in September 2008, and was in regular contact with Kaczmarczyk and Anita at various hearings and meetings. At an October 2008 hearing, Kaczmarczyk and Anita were ordered to appear at a January 2009 hearing. A few weeks later, the District Attorney filed a request for a hearing to obtain an order to get records as part of its investigation of alleged child abuse and lewd acts on children at the day care, and Kaczmarczyk was informed of the allegations being investigated. The court set a December 19, 2008, hearing date.[12]

Kaczmarczyk left the country in early December 2008 and, after a stopover in Taiwan, entered Hong Kong. He then reentered Taiwan on January 8, 2009. Just before leaving the United States, Kaczmarczyk set up a bank account that allowed him to draw cash from ATM machines in Hong Kong and Taiwan. Kaczmarczyk was located in Taiwan by local police, who determined that he had entered without a visa, which limited his permissible stay in Taiwan to 30 days, and Kaczmarczyk stayed much longer than

---

[11] Deven did develop a severe rash during the time he was in Anita's day care, which started on his inner thigh and spread almost to his ankle, leaving a hideous scab and bumps. The rash later spread to his trunk and both arms. Doctors could never specifically identify it but said it was probably some sort of yeast infection. Dr. Murray's review of the records led her to state the rash was typical of Candida infections or dermatitis, but did not think the rash caused the blood in Deven's diaper.

[12] A criminal complaint was issued against Kaczmarczyk on January 27, 2009.

was allowed.  Local police had been unable to find him through credit card records because Kaczmarczyk apparently did not use his credit cards.  Additionally, although Kaczmarczyk registered his hotel as the Shanwan Hotel in Taipei City, he never stayed there.  Local police were finally able to find him using phone records, and he was arrested and deported back to the United States.

B. <u>The Defense</u>

Kaczmarczyk contended Jane Doe was abused by her father, Patrick, not by him.[13]  A neighbor of Patrick testified he saw Jane Doe on the evening of September 11, 2007, and she was playing normally and appeared happy.  Patrick's former mother-in-law, Carole, testified Patrick called her on the evening of September 11, 2007, and told her about the blood in Jane Doe's diaper.  Carole told Patrick he should take Jane Doe to be examined and should keep the diapers with the blood on them.  Patrick made an appointment for the following day but resisted her suggestion that he take Jane Doe to the hospital that night.  The next day, Carole spoke to Vanessa and told her to pick Jane Doe up from day care and take her to the hospital.  Carole had been the person who arranged for placement into Anita's day care.  Carole had done some checking on Anita before placing Jane Doe into Anita's day care, and had visited the day care seven to 10 times. On each occasion, Kaczmarczyk was present.

Anita called Dr. Carroll, a psychiatrist who had experience with sex offenders. Dr. Carroll reviewed the records, the police reports, and interviewed Anita.  Dr. Carroll

---

[13]  He also asserted Anita was responsible for diapering and caring for John Doe and Kaczmarczyk could not be connected to any abuse of John Doe.

testified Anita did not seem to fit the profile for a sex offender, and she did not seem sufficiently meek and passive that she would have assisted a pedophile. He also noted women almost never, if ever, sexually abuse infants or small children.

II

THE SUBSTANTIAL EVIDENCE CLAIM

Kaczmarczyk contends the guilty verdicts must be reversed because the evidence was insufficient to support the conclusion that Kaczmarczyk was the perpetrator of Jane Doe's injuries.[14]

A. Legal Principles

When a defendant challenges the sufficiency of the evidence to support a conviction, our review is limited to reviewing the entire record to determine whether substantial evidence supports the verdict. Substantial evidence is defined as evidence that is reasonable, credible, and of solid value. (*People v. Elliot* (2005) 37 Cal.4th 453, 466.) "The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.] The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.] Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence

---

[14] On appeal, Kaczmarczyk appears also to contend there was no substantial evidence the injuries were caused by sexual contact rather than by some other causal force. However, both the nature of the injuries and the expert opinion of Dr. Murray provided ample evidence from which a jury could conclude the blunt force trauma that produced the injuries to Jane Doe's vaginal area was the product of purposeful human acts rather than from accidental injury. Indeed, Kaczmarczyk's counsel below made no effort to claim the injuries were caused by accident, but instead argued the evidence showed the perpetrator was Patrick rather than Kaczmarczyk.

susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court[,] that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]" ' " (*People v. Kraft* (2000) 23 Cal.4th 978, 1053-1054.) In applying this standard, we must affirm the judgment unless under " 'no hypothesis whatever is there sufficient substantial evidence to support [it].' " (*People v. Nishi* (2012) 207 Cal.App.4th 954, 966.) Because it is "the exclusive function of the trier of fact to assess the credibility of witnesses and draw reasonable inferences from the evidence" (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330), we may not merely retry the case on appeal and, accordingly, the defendant "bears an enormous burden" when challenging the sufficiency of the evidence. (*Ibid.*)

B. Analysis

We conclude substantial evidence supports the verdicts. A rational trier of fact could have inferred, from all of the surrounding facts and circumstances, that Kaczmarczyk inflicted the injuries to Jane Doe. A reasonable trier of fact could conclude Jane Doe's injuries were inflicted on September 11, 2007. Vanessa testified Jane Doe had no bleeding or injuries before 7:00 or 7:30 a.m. on September 11, 2007, when Vanessa left Jane Doe at Anita's day care, and Dr. Murray testified the injuries she observed when she examined Jane Doe on the late afternoon of September 12 were "fresh" (less than 72 hours old). Moreover, phone records showed Patrick made

14

numerous phone calls to Vanessa starting around 8:00 p.m. that evening. If the jury credited the testimonies of Patrick and Vanessa--that he was calling to report the blood spots on Jane Doe's diapers--this evidence would have fixed the time during which the injuries were inflicted at between 7:00 a.m. and 8:00 p.m. on September 11, consistent with the medical findings of Dr. Murray as to the timing of the injuries.

The only adults potentially alone with Jane Doe during that time period were Kaczmarczyk, Anita and Patrick. Patrick denied he inflicted the injury, and the jury was entitled to credit that testimony.[15] (*People v. Friend* (2009) 47 Cal.4th 1, 41 [jury is exclusive judge of credibility and appellate court must defer to jury's determination unless the testimony involves physical impossibility or obvious falsity].) Moreover, Patrick's other testimony (which the jury was again entitled to credit) was that Jane Doe was "fussy" when he collected her from Kaczmarczyk's care, lacked her normal appetite that evening, and was "fussy" when he bathed her that night, which provided an additional basis from which the jury could infer the injury occurred before Patrick retrieved her from Anita's day care.

The jury had ample evidence from which to infer Jane Doe was injured between the time that Vanessa left her at Anita's day care and the time Patrick picked her up, which Dr. Murray stated was consistent with her medical findings. Accordingly, we must

---

[15]    The jury's decision to credit Patrick's testimony finds additional support in the testimonies of Dr. Murray and Detective Vella. Both witnesses confirmed Patrick was quite upset about the injuries. Moreover, a jury could well conclude that, if Patrick had been the molester, his reaction would have been to *hide* the injury rather than to report it and trigger the involvement of the authorities.

assess whether the jury's conclusion--that it was Kaczmarczyk rather than Anita who inflicted the injury--is supported by substantial evidence. Patrick testified Kaczmarczyk phoned him that night around 9:00 p.m., which was unusual,[16] and one of the inquiries posed by Kaczmarczyk was to see if everything was all right and if Jane Doe would be back the following day. Kaczmarczyk's concern about Jane Doe continued to manifest itself two days later when police, while interviewing Anita at her home, overheard Kaczmarczyk call her and say, "And, uh, well, oh, and I was just wondering if you've heard from, uh, either Patrick or Vanessa pertaining to, uh, what's going on with, uh, that situation." Finally, when the investigation accelerated at the end of 2008, Kaczmarczyk fled to Taiwan, provided a false address, hindering the ability to find him in Taiwan, and apparently eschewed the use of credit cards (in favor of paying cash) to further hinder the ability of the authorities to locate him.[17] We conclude substantial evidence supports the jury's determination that Kaczmarczyk, rather than Patrick or Anita, caused the injuries to Jane Doe.

---

[16] Phone records confirmed a call was placed from Kaczmarczyk's phone to Patrick's phone that night around 9:00 p.m.)

[17] Kaczmarczyk correctly notes that flight alone is not sufficient to prove guilt. (§ 1127c.) However, although a jury may not consider flight as dispositive, it may consider flight as tending to show a consciousness of guilt. (*People v. Carter* (2005) 36 Cal.4th 1114, 1182.) Flight may be considered " 'whenever evidence of the circumstances of defendant's departure from the crime scene or his usual environs, . . . logically permits an inference that his movement was motivated by guilty knowledge.' " (*People v. Lucas* (1995) 12 Cal.4th 415, 470.)

THE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Kaczmarczyk claims he was deprived of effective assistance of counsel because his counsel (1) did not object to evidence of Kaczmarczyk's inappropriate behavior toward women who were clients of Anita's day care; (2) did not timely request the court strike the evidence as to the other alleged victims pursuant to Evidence Code section 352 after the court dismissed those counts under section 1118.1; (3) did not object to a comment made by the prosecutor during closing argument; and (4) did not present evidence that Kaczmarczyk had called Patrick on occasions other than on September 11, 2007.[18]

A. Legal Framework

To establish ineffective assistance of trial counsel, a defendant must demonstrate that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's deficient representation resulted in prejudice to him, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. (*In re Jones* (1996) 13 Cal.4th 552, 561.)

A court's review of defense counsel's performance is a deferential one, and we indulge a strong presumption that counsel's conduct falls within the wide range of

---

[18]    Kaczmarczyk also contends he was denied effective assistance of counsel because counsel did not request some form of instruction pursuant to *People v. Mullens* (2004) 119 Cal.App.4th 648 (*Mullens*).  We separately evaluate that claim below.

reasonable professional assistance.  (*In re Jones, supra,* 13 Cal.4th at p. 561.)  It is defendant's burden to show inadequacy of trial counsel, and reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance.  (*People v. Lucas, supra,* 12 Cal.4th at pp. 436-437.)  Where the record affirmatively shows counsel's omissions "resulted from an informed tactical choice within the range of reasonable competence," we must affirm the conviction.  (*People v. Pope* (1979) 23 Cal.3d 412, 425, disapproved on another ground by *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.)  "[I]f the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . .' "  (*People v. Cudjo* (1993) 6 Cal.4th 585, 623.)

"A defense counsel is not required to make futile motions or to indulge in idle acts to appear competent" (*People v. Torrez* (1995) 31 Cal.App.4th 1084, 1091), and is not required "to make all conceivable motions or to leave an exhaustive paper trail for the sake of the record.  Rather, competent counsel should realistically examine the case, the evidence, and the issues, and pursue those avenues of defense that, to their best and reasonable professional judgment, seem appropriate under the circumstances." (*People v. Freeman* (1994) 8 Cal.4th 450, 509.)

B. <u>Analysis</u>

Kaczmarczyk first contends trial counsel should have objected to evidence of Kaczmarczyk's inappropriate behavior and sexual comments toward several of the mothers of the alleged victims.  However, the record is silent on why counsel did not

object, and we therefore must reject the claim of ineffective assistance unless there could be no satisfactory explanation for permitting this evidence. (*People v. Cudjo, supra,* 6 Cal.4th at p. 623.) We conclude counsel may well have made the reasonable tactical decision to allow this evidence because it provided a platform for counsel to argue (as he did in his closing argument) that Kaczmarczyk's sexual interest was towards adult females, to undercut the prosecution's claim that he sexually abused infants and toddlers, three of whom were male.

Kaczmarczyk next contends counsel was ineffective because, after the court dismissed the counts as to the other alleged victims, his counsel did not explicitly request that the court strike the evidence pursuant to Evidence Code section 352. However, counsel for Anita did argue, considering the dismissal of the counts as to Jack and Deven, the evidence should not be admissible as Evidence Code section 1101, subdivision (b), evidence. The court overruled the objection, citing Evidence Code sections 1101, subdivision (b), and 1108. A ruling admitting evidence under Evidence Code sections 1101, subdivision (b), and 1108 necessarily contains an implied ruling that the evidence "is not inadmissible pursuant to Section 352" (§ 1108; *People v. Falsetta* (1999) 21 Cal.4th 903, 916-920), and there is no requirement that a court explicitly state on the record that it has engaged in the balancing test under section 352. (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1053.) Because a defense counsel is not required to "indulge in idle acts" (*People v. Torrez, supra,* 31 Cal.App.4th at p. 1091) or "to leave an exhaustive paper trail for the sake of the record" (*People v. Freeman, supra,* 8 Cal.4th at p. 509) to provide competent representation, we are not persuaded by Kaczmarczyk's claim that his

19

counsel was incompetent for not requiring the court to make explicit what was implicit in the court's ruling.

Kaczmarczyk also contends his counsel was ineffective because counsel did not object to the prosecutor's comment, made during closing argument, that "putting a penis in a little two-year-old's vagina is likely to produce great bodily injury and it did here." However, counsel is not required to "indulge in idle acts" (*People v. Torrez, supra,* 31 Cal.App.4th at p. 1091), and any objection would have been futile. A prosecutor is given wide latitude in closing argument and, as long as the argument amounts to a fair comment on the evidence, a prosecutor has broad discretion to state his or her view on what the evidence, and the logical inferences drawn from the evidence, has shown. (*People v. Welch* (1999) 20 Cal.4th 701, 752.) The evidence from Dr. Murray was that Jane Doe's hymen was torn, and an object larger than a finger caused significant injuries. The injuries were consistent with attempted or completed intercourse with a penis, although it was also consistent with the insertion of fingers if there had been multiple insertions. Because the injuries were inflicted to a part of the genitalia commonly associated with intercourse, the conclusion urged by the prosecutor--that it was penile insertion that caused the injuries--was a fair comment on the evidence, and any objection would have been futile.

Kaczmarczyk finally contends his counsel was ineffective for not presenting evidence that Kaczmarczyk phoned Patrick on days other than the day of Jane Doe's injury, and therefore the phone call was not a unique event, as portrayed by Patrick's testimony. However, while cross-examining Patrick, counsel *did* elicit his admission that

20

Kaczmarczyk had called Patrick in the past. Moreover, Patrick's testimony was not that *receiving* a phone call from Kaczmarczyk was unusual, but was instead that it was unusual for him to call Patrick *that late at night*. The foregoing analysis convinces us Kaczmarczyk was not deprived of effective assistance of counsel.

IV

THE *MULLENS* CLAIM

Kaczmarczyk asserts the court's refusal to allow the defense to inform the jury of the acquittal on counts 3, 4, 5 and 6 was error under *Mullens, supra,* 119 Cal.App.4th 648, and the error warrants reversal.

A. Background

Kaczmarczyk was charged with four counts (counts 3, 4, 5 and 6) involving sexual abuse of Deven and Jack, and the jury heard the evidence allegedly linking Kaczmarczyk to those alleged offenses. After the close of the prosecution's case, the court granted Kaczmarczyk's section 1118.1 motion to dismiss those charges. However, the court ruled the evidence admitted as to those counts would remain available under Evidence Code section 1108 because of the different standard of proof under Evidence Code section 1108, and that it would fashion an appropriate modification to the jury instructions to guide the jury's application of the evidence concerning Deven and Jack as to the remaining counts.

Later that day, the parties discussed the jury instructions, and the court then began instructing the jury, and included an instruction conveying the principles of Evidence Code section 1108. Neither party requested, nor did the court give, any form of

21

instruction under *Mullens*. The court, after informing the jury it would complete its instructions the following day, then released the jury for the day. After the jury was excused, the court informed the parties it would give CALCRIM No. 205, which addresses charges removed from the jury's consideration.[19] Although neither defense counsel requested either an instruction under *Mullens* or for leave to introduce evidence of the acquittals, Kaczmarczyk's counsel did ask whether CALCRIM No. 205 barred the defense from arguing those counts were dismissed because the prosecutor "did not meet the burden of proof" as to those counts. The court stated CALCRIM No. 205 barred the defense "completely from . . . even referencing that. You treat them as though they weren't ever there." The court acknowledged the evidence would be argued as Evidence Code section 1108 evidence "[b]ut don't say, these are the same charges that you used to have against both of the defendants, but the judge didn't think there was enough evidence to give them to you, and that's why they're now [Evidence Code sections] 1108 and 1101 [evidence]."

B. Legal Principles

The jury was presented with "other crimes" evidence.[20] When the other crimes evidence involves conduct for which the defendant has been charged but acquitted in a

---

[19]    The jury was instructed: "Counts 3, 4, 5, and 6, and their attendant allegations, no longer need to be decided in this case. Do not speculate or consider in any way why you no longer need to decide those counts."

[20]    The ordinary rules governing the admission of other crimes evidence are well established. Evidence of other crimes or bad acts is ordinarily inadmissible when it is offered to show that a defendant had the criminal disposition or propensity to commit the

22

prior criminal proceeding, the so-called "*Griffin* rule," derived from *People v. Griffin* (1967) 66 Cal.2d 459, places additional conditions on the admission of that evidence. In *Mullens, supra,* 119 Cal.App.4th 648, we summarized the *Griffin* rule as follows:

> "In sum, [*Griffin*], and its progeny, as they pertain to this case, stand for the proposition . . . that if a trial court permits the prosecution to present evidence that the defendant committed one or more similar offenses for which he or she is not charged in the current prosecution, the trial court must also allow the defense to present evidence of the defendant's acquittal, if any, of such crimes, and failure to allow such acquittal evidence constitutes error." (*Mullens, supra*, 119 Cal.App.4th at pp. 664-665.)

Additionally, we recognized in *Mullens* that the trial court in such a case is *required* to admit evidence of the defendant's acquittal, because evidence of the acquittal of the previously charged offense "was admissible as a matter of law under [*Griffin*] and its progeny." (*Mullens, supra*, 119 Cal.App.4th at p. 669.) Indeed, *Mullens* specifically rejected the People's assertion that a trial court nevertheless retains discretion under section 352 to exclude *Griffin* evidence, explaining that "[f]or the reasons already discussed, if the court in conducting its section 352 analysis decides that the section 1108 propensity evidence should be admitted, the court *must also admit the evidence of acquittal* to rebut the propensity evidence. The admission of acquittal evidence under the *Griffin* rule to rebut the propensity evidence assures fundamental fairness and protects the

---

crime charged. (Evid. Code, § 1101, subd. (a).) However, evidence of other sexual crimes is admissible to prove a disposition to commit such acts (Evid. Code, § 1108), as long as it not inadmissible under Evidence Code section 352. The court permitted the use of the other crimes evidence under Evidence Code sections 1108 and 1101, and Kaczmarczyk does not claim on appeal that the admission of such evidence was an abuse of discretion.

defendant's due process right to a fair trial and the right to present a defense." (*Mullens,* at p. 670, fn. 9, italics added.)

C. <u>Analysis</u>

We conclude that, although Kaczmarczyk was deprived of effective assistance of counsel because counsel did not interpose *Mullens* as authority for permitting evidence and argument concerning the acquittals on the other alleged crimes committed against Deven and Jack,[21] it is not reasonably probable Kaczmarczyk would have obtained a more favorable result had counsel interposed that evidence. (*In re Jones, supra,* 13 Cal.4th at p. 561.)

The *only* supplemental information that would have been available to the jury had counsel timely interposed *Mullens* was that the evidence concerning Deven and Jack (which the jury heard) did not satisfy the court beyond a reasonable doubt that Kaczmarczyk committed a crime against Deven or Jack. However, this information would not have precluded the jury from employing the evidence as to Deven and Jack in considering the remaining criminal charges, provided the jury nevertheless concluded from a preponderance of the evidence that Kaczmarczyk committed offenses against

---

[21]     Kaczmarczyk suggests the issue was preserved because the court sua sponte should have instructed the jury in some fashion concerning the acquittals. While *Mullens* and *Griffin* authorize *introduction of evidence* of the acquittals, neither imposes a sua sponte *instructional* obligation on the trial court, and we decline to impose one here. We apprehend the burden is on counsel to raise the *Griffin/Mullens* evidentiary caveat when other crimes evidence is introduced, which counsel did not do here. Because we cannot imagine any informed tactical reason for not raising the *Griffin/Mullens* evidentiary authorization, we conclude the issue may be raised on direct appeal within the rules governing claims alleging ineffective assistance of counsel.

Deven and Jack. Indeed, the jury was properly instructed that any consideration of the evidence concerning Deven and Jack was conditioned on the jury's predicate determination that the prosecution proved by a preponderance of the evidence that Kaczmarczyk had committed offenses against Deven and Jack. These instructions did not offend the principles outlined in *Mullens* or *Griffin*.

The defect here was thus not the result of instructional error, but was instead evidentiary in nature: counsel's failure to raise *Mullens* resulted in the absence of evidence concerning the ruling on Kaczmarczyk's section 1118.1 motion. The erroneous creation of such an evidentiary lacuna is tested for prejudice under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*Mullens, supra*, 119 Cal.App.4th at p. 669.) Applying *Watson*, we are convinced it is not reasonably probable Kaczmarczyk would have achieved a more favorable result had counsel raised *Mullens* and thereby admitted evidence of the acquittal. The core purpose for admitting evidence of the acquittal under *Mullens* is to give the jury the full picture concerning the other crimes evidence and thereby insure the jury "reach[es] a verdict that is based not on who the defendant is, but on what the defendant did." (*Id.* at p. 666.) Here, the undisputed physical evidence was that someone penetrated Jane Doe's vagina, and the evidence was strong that this abuse occurred while Jane Doe was in the custody of Kaczmarczyk and Anita. Even though the "other crimes" evidence was not tempered by the evidence of the acquittals, the jury did not convict Kaczmarczyk of all of the remaining charges: it *acquitted* Kaczmarczyk of the alleged crimes against the *male* victim (even though the other crimes evidence all involved *male* victims) while convicting Kaczmarczyk of the crimes involving sexual

25

penetration of a *female* victim.  This verdict convinces us that, even without the evidence that Kaczmarczyk had been acquitted of the alleged crimes against two other male victims, the jury did reach its "verdict based not on who [Kaczmarczyk] is, but on what [Kaczmarczyk] did" (*id*. at p. 666), and therefore there is no reasonable probability that, but for counsel's failings, the result would have been more favorable to Kaczmarczyk. (*In re Jones, supra,* 13 Cal.4th at p. 561.)

V

CUMULATIVE ERROR

Kaczmarczyk contends the cumulative errors in his trial denied him a fair trial, even if considered individually each was not prejudicial.  However, we conclude there were not multiple errors and therefore there is no basis for the cumulative error assertion.

DISPOSITION

The judgment is affirmed.

McDONALD, J.

WE CONCUR:

HUFFMAN, Acting P. J.

NARES, J.

26